181545 David Seth Worman et al. v. Mark Healey et al. Good morning, your honors. May it please the court. I'm John Parker Sweeney. I represent the plaintiff appellate to the Worman case. Do you mind just moving your mic closer to the mic so I can hear you a little better? Certainly. How's that, your honors? That's good. With the court's permission, I reserve two minutes for rebuttal. We're here today because Massachusetts bans common semi-automatic rifles and their standard capacity magazines. This should be straightforward because the principle in Heller is that common arms cannot be banned. These challenge laws unconstitutionally and fringe the rights of the plaintiffs. I know your argument was that common, apropos of Heller, that commonly held weapons used for defensive purposes may not be wholly banned. Are you broadening your view of Heller? I am stating the holding of Heller, your honors. The holding of Heller is an arms that are in common use. That is, typically possessed by law-abiding citizens for lawful purposes, which may include self-defense, may not be banned. Okay. Just so I understand, that's not a class of arms? That's any arm? Correct. Now, a categorical ban, as we are facing here, is the definition of some category of arms and a ban of that category. And that's what Massachusetts has done. That is a categorical ban. I'm not following what your proposed rule is. Is it that any arm that is in common use for lawful purpose cannot be banned? Or is it that a category of arms cannot be banned under Heller? The former, and the ban of the category. So here, if it was a thing that said one of the things on that list, one of the arms listed, just one of the guns, if that was the only one prohibited, you would say that itself under Heller is unconstitutional? That is correct. You cannot single out the handgun being quintessentially useful for defense in the home if, as you say, because a handgun clearly is an arm in common use. So it's odd that in Heller they went to the trouble of simply, not simply saying it's an arm in common use, it's banned, that's the end of it. And instead did at least a paragraph on why it was such a quintessentially important and useful weapon for defense in the home. So why was that critical to the resolution of that case, Your Honor? How do I know that? Because Justice Scalia said, whatever the reason, as long as they're chosen by law-abiding citizens, they're typically kept in the home, they cannot be banned. As long as a weapon is chosen for self-defense purposes, that's what he says in that paragraph. That is not what he says in that paragraph, and it's not what he says in that opinion. What he says in that opinion is, these are common arms that are found in the home. The Miller case, where he derived this test from, talked about the arms that were kept in the home. They were arms that were used for defense in the home. They were used for other lawful purposes as well. But we don't have a conundrum here, because the arms that are banned are kept in the home for defensive purposes. They are kept in the home for defensive purposes by plaintiffs in this case. They're kept in the home for defensive purposes by the 10,000 Massachusetts citizens that purchased them in 2015. They're kept in the homes of millions of Americans for, among other reasons, self-defense. Firearms have both offensive and defensive use. The banned firearms and the banned magazines have both. If they are chosen by law-abiding citizens to be kept in the home for many lawful purposes, including self-defense, they cannot be banned, even if they are subject to significant criminal misuse. Because if that were the rule, then Heller could not possibly have come out the way it came out. Why is that? Because handguns are responsible for the vast majority of firearms violence in this country. And if the test was, are they capable of being criminally misused to cause harm, they can be banned. Heller could not have been decided by the way it was decided. There's two different issues. There's the question of whether it's an arm and is encompassed within the scope of the Second Amendment. And I understand some of your arguments sound to me as if you are challenging the District Court's conclusion that it is not an arm covered by the Second Amendment at all. If it is an arm covered by the Second Amendment, there is still the question of what regulation, restriction, bans may or may not be done to it. And as to that question, it sounds like what you're saying is you never reach it. Because if it is an arm, any ban on even a single type of arm is automatically a violation of the Second Amendment. And you're deriving that from what I see in Heller says that because Heller did an inquiry into the quintessential usefulness of the handgun to defense in the home and talked about fire safety laws not burdening as much the right to self-offense as the handgun ban there did, which suggests that one has to do an inquiry into the burdens that's imposed by the statute restricting what can be done with a particular arm even if that arm is covered by the Second Amendment. No, I respectfully reject that, Your Honor, and let me explain why. Heller had the opportunity to engage in that kind of exhaustive inquiry with respect to the nature of the handgun and balancing the use and the burdens of the handgun ban on the one hand versus its propensity to prevent firearms violence on the other hand. That was exactly what Justice Breyer urged in his dissent, which was joined by others. But that was rejected. He did reject a general proportionality test, which is what Justice Breyer, citing his own opinions, proposed. But the question I'm asking you is where you derive in Heller the conclusion that any arm in common use, just by virtue of being an arm in common use, is something that cannot be banned. Because I don't see where in Heller you could derive that rule given Heller's own analysis of the fact that the gun there was for the quintessential purpose of self-defense. Again, the fundamental bedrock principle of Heller is that bearable arms, prima facie, are protected by the Second Amendment. Yes, but prima facie means that there are some instances where they're not going to be, where that protection's not going to be absolute. It seems to me that there are three components to any Second Amendment inquiry. One is the person. We're not involved with that here, but certainly there can be regulations under the Second Amendment of what I loosely refer to as prohibited persons, felons, mentally disabled people, who can lawfully be restricted from access to firearms. Second is place, because there is no question in my mind, from a reading of Heller, that the home is given a special kind of primacy in Second Amendment inquiries, as is indeed recognized in this Court's decision in Gould. And the third is as to the arms themselves. And I happen to agree with Judge Barron that there is one question as to whether the arm is covered, and there is a second question that must be asked as to whether it is subject to regulation, even though it is an arm. In the Catano case, the Supreme Court reversed and remanded, without even hearing argument on the merits, the stun gun ban in Massachusetts. That case resolved on remand. It came up again in the Ramirez case, and the Supreme Judicial Court of Massachusetts said this is a categorical ban of common arms. It is forbidden by Heller. And you can regulate, which means persons, places, but you can't absolutely ban. Now the difference, you're suggesting I gather, is that those are stun guns, these are semi-automatic rifles. Therein lies the difference. Can I just, before you go too far down this, this does not ban semi-automatic rifles. Excuse me? This does not ban semi-automatic rifles. It does, Your Honor. No, it does not. It does, Your Honor, respectfully. It bans semi-automatic rifles. It exempts certain semi-automatic rifles. I think that means it does not ban semi-automatic rifles. It puts a restriction on the types of semi-automatic rifles that may be held. Correct? Yes, but the line that is drawn defies distinction. There are firearms that are included or not included without regard to any particular feature. I thought all shotguns and rifles that cannot take more than five rounds are exempt. That is correct, Your Honor. So that's just not a ban on semi-automatic rifles. It's a ban on semi-automatic rifles that can take more than five. That is correct, Your Honor. So is that... The availability of protected arms cannot save a ban of protected arms. I don't know what you mean by a ban, then. Why isn't that just a regulation requiring or restricting firearms that have more than five rounds? Well, since when is a ban something that allows but prohibits at the same time? That's what a regulation... If it's no longer... That's called a regulation. I respectfully disagree, Your Honor. Isn't that what a regulation does? It allows you to do some things and prohibits you from doing other things. Not with respect to the nature of the arms that you're allowed to use. The handgun ban in Heller banned all handguns, correct? It did. It had no exemption depending on rounds. That's correct. That's not true here. That is correct that it's not true here. However, there was also an offer by the District of Columbia to say, we will allow our ban on operable long arms in the home to be violated by anybody who wants to use them for self-defense. And the Supreme Court said you cannot substitute other arms for protected arms. And the same thing came up in the Cayetano case, where the Supreme Judicial Court of Massachusetts said, first time around, you can always go out and get a firearm. You don't need a stun gun. You cannot substitute protected arms for other protected arms to say the ban on protected arms if that ban is not allowed. But that's a matter, with all respect, that's a matter of semantics. Because if the class that you look at is semi-automatic rifles, then some are permitted, or semi-automatic guns, some are permitted, some are not. The ones with higher capacity magazines, et cetera, are not. But that doesn't mean, unless you define it that way, that an entire class of weapons is banned. Because your logic, just to follow on that, just before you, just so I get the, suppose the ban was simply semi-automatic rifles fitted to take grenade launchers. Is that a ban? Yes. Okay, well, I get your position then. But it's a ban because you are arbitrarily saying what a category or a class is. There is no higher class that we can point to and say, oh, this is a class. Suppose the government wanted to impose safety regulations so that you had smart gun technology required. You'd say that was a ban because it banned all weapons that didn't have the technology. That's a far more complicated argument. I'd have to understand the mechanism of what that would be and what the definitions would be. No, but what you were doing in your argument, and I think in answer to Judge Barrett's question, is you are defining whatever may be prohibited as a class in and of itself. And therefore, every time you find an objectionable limitation, you say the entire class is limited, and in this case banned. That is not the way categories are treated, as has been pointed out. Some semi-automatic weapons have a firing capacity of less than five rounds. Others have more. Your argument seems to assume that the only so-called class that you look at is the segment of semi-automatics that are banned, and it seems to me that that is just a fundamental fallacy. What is your answer to that? If I may ask you, my time is up. You definitely may be up. A category is whatever is defined to be included within it, and if you define a category as all semi-automatic rifles, then that's your category. If you define it less than that, then that's a lesser category. But it's still a category. It doesn't instantly become a subcategory. It's the definition of the ban that determines that it's a category. Go ahead. No, I was going to say, as Judge Selye said, it is purely a question of semantics here. As you say it in that context, and as Judge Selye did, it is a question of semantics because it's not the rule in Heller. As I started out, the rule is you can't ban common arms. But Heller doesn't tell us whether a ban is what you define it as. That's the whole question. What Heller does tell us is that people choose certain arms for use in the home for lawful purposes, and the government cannot ban those. These firearms, it's undisputed, fall into that category. But Heller tells us they can't be banned. I see my time is up. Good morning again, Your Honors. Assistant Attorney General Julie Kobach for the defendants. The Commonwealth's assault weapons ban prohibits a narrow subset of extraordinarily lethal weapons with unique military origins that today are chosen disproportionately to commit mass public shootings and to murder police officers. The district court correctly ruled that the assault weapons in large capacity magazines covered by the statute are not protected by the Second Amendment because they are like those weapons most useful in military service that may be banned. And its decision should be affirmed on that basis and on the alternative basis that the assault weapons ban survives constitutional scrutiny under the framework adopted by this court's decision in Gould. On that first point, could you just help me out with something which is, I know some courts have followed or done what the district court did here and read that passage about like military weapons and then concluded that anything that can be described as being like it or most like it, I guess to be fair, most like it is outside the scope of the Second Amendment. As I read that passage, or at least as some people have suggested, that passage from Heller is simply a meditation on the earlier description of dangerous and unusual weapons being outside the scope of the Second Amendment because if that's true, it leads to the potentially paradoxical result that military arms would be outside the scope of the Second Amendment, which then raises a tension between the operative clause and the prefatory clause. And Justice Scalia says, well, that's no tension at all given how history has changed. There's almost no arm that would constitute as in common use that would be much use in a modern military given the kind of firepower that now exists. But it wasn't true back in the day, so his construction of the Second Amendment. You are suggesting, as the district court did, that we take that meditation on the dangerous and unusual and read it to be a test that exempts anything that is like a military weapon from the scope of the Second Amendment. So could you just comment on how we should understand that passage in context? Sure. I have a couple of responses. So the first is I think that passage is the clearest statement in Heller on the scope of what arms are covered. But it also fits perfectly with the theory that I understand Heller adopted. So Heller said at the time of the founding, male citizens would bring those arms that were used at home for self-defense with them to militia service. But then the decision went on to say in today's context, to be effective, a militia would need more sophisticated arms. And it gave examples. So M16 rifles and the like were one example. I think it referred to tanks and bombers as well. And the court said that those weapons are not the types of weapons that would be useful for self-defense. The part that you're skipping over, and it doesn't appear in your brief either, is the passage in Heller that describes dangerous and unusual weapons as outside the scope. And my question is, why is it the case that a passage describing M16s, which are dangerous and unusual, helps us very much with a weapon that is dangerous, but arguably not unusual like the weapons here? This is just for purposes of whether the Second Amendment treats them as arms. Not at all with respect to the question of whether they can still be then restricted or regulated. I don't read Heller to elevate the dangerous and unusual language as a stand-alone test, or even much at all. And I'll tell you why. The first time it referred to that common law tradition, it referred to dangerous or unusual weapons. That's at page 624. And then in the passage that Your Honor refers to at page 627, it says there's a historical tradition of regulating dangerous and unusual weapons. And it says Blackstone, which uses the oar. I don't think that Heller's own inconsistency in how it even described that test can't mean that that test is kind of a stand-alone test that governs the scope of the Second Amendment. I think it was just an additional common law support for this phrase in common use at the time for lawful purposes like self-defense. So I don't take the dangerous or unusual to have quite the import that I think your question gives to it. Rather, I take the language weapons that are most useful for military service, M16s and the like, to be a far more specific statement about the scope of weapons that are covered by the Second Amendment and the types of weapons that can be banned. And so Heller said that these sophisticated arms like M16 rifles are not the types of weapons that would be useful for a militia today, and they're not the types of weapons that would be used for self-defense in the home, and they can be banned. And the court, as your Honor recognizes, said that leaves a poor fit between the prefatory and the operative clauses, but it was comfortable with that outcome. And I think in this case, the record is just about undisputed that the weapons that are covered by this statute are like weapons that are most useful in military service. So there's no dispute about the historical similarity between the weapons or the functional similarity. The only argument between the parties is whether Heller drew this bright line between automatic and semi-automatic weapons, and I think it emphatically did not. There's nothing in the decision that suggests that automatic weapons marks a constitutional boundary, and we know from the record that these weapons are virtually interchangeable. So a semi-automatic rifle that's regulated by the law can simulate an automatic rate of fire by adding a bump stock or a trigger crank, as we saw in the Las Vegas massacre, by using a rubber band or just by bump firing. The Army itself instructs soldiers to fire in semi-automatic mode as a default mode of firing, and the rate of fire is virtually meaningless from the perspective of victims. Your position is that as military technology changes and military warfare becomes more sophisticated, more and more dangerous types of arms will be available to citizens? I think this case illustrates that, Your Honor, and I want to pick up... No, no, but it would seem to me that that would be a result that the Attorney General would not desire. Absolutely. Because under your theory, if sophisticated technology takes its course and wars in the future are fought exclusively by missiles and rockets and other airborne devices, that would mean that any type of portable arm would therefore not be within the exclusion and would be subject to Second Amendment protection. So someone could decide that he wanted a bazooka for self-defense and keep it by his bedside. I think that's the plaintiff's theory of the case. But I think you're playing into that if you ask us to treat the Second Amendment as being a proxy for what is in military use at any given time. Well, however, it's clear that weapons that are in military use can be banned, but that doesn't mean that weapons that are in common... If you read that statement as being something other than an exposition on what the court meant by dangerous and unusual weapons. Sure. I'd like to also just pick up on, I think, one serious risk that Your Honor is alluding to of the plaintiff's theory, which is that if the plaintiffs are right, that any weapon in common use anywhere in the country becomes constitutionally protected as soon as it attains a sufficient level of popularity, that has very serious federalism implications. So there are many populous states that might choose not to regulate extraordinarily dangerous weapons. And under the plaintiff's theory, if enough consumers choose to buy those weapons, then that prevents all other states from banning those weapons or possibly even regulating them. And that can't be what Heller decided or what the Second Amendment stands for. It can't be that one state's policy choices would restrict all 49 other states from regulating weapons that pose a very serious public safety risk, like the weapons at issue here. So I think that the plaintiff's theory just isn't tenable under Heller or under McDonald, which guarantees states the ability to... How do you deal with the clear information in Heller that weapons in common use should gain Second Amendment protection, some Second Amendment protection? Well, I take Heller to say weapons in common use for lawful purposes, like self-defense, and I think that self-defense limitation is a critical limitation, because Heller said that self-defense is the core of the Second Amendment. So why aren't these semi-automatic weapons in common use by lawful citizens for self-defense? The appellants tell us they are, and they have statistics that indicate that a great many of them have been bought and are in the possession of law-abiding citizens. So the record is clear that these are weapons of offense, not weapons of defense, and that they're virtually never used for self-defense. The plaintiff's six experts couldn't identify a single example of the use of any of the regulated weapons, any of the assault weapons or the large-capacity magazines for use in self-defense. The design of the assault weapons themselves shows that these are offensive weapons. But those experts' opinions didn't reach the conclusion that you espoused, did they? No, but that's a question of law. You're attacking the validity of their opinions because of the lack of empirical evidence. Right, when there's a lot more evidence in the record that supports the conclusion that these are not defensive weapons. So if that's so, if what we're dealing with is conflicting evidence in the record from their experts and the evidence that you have, why is this case up on summary judgment? Why isn't there a fact question here that a juror should be deciding? I don't think there was conflicting evidence in the record. So what the plaintiffs have pointed to is evidence that consumers want to use these for self-defense, but not that they're actually in common use for self-defense, that they're actually used by civilians for self-defense. The record on that question is clear. So there was an analysis of the NRA self-defense stories database that found, on average, people fired two shots in self-defense, and in some years, never more than ten. The NRA's guides to self-defense in the home and outside the home don't mention assault weapons. And this court's decision in Hightower is also important. It says that large-capacity weapons, like assault weapons and large-capacity magazines, are not of the type characteristically used to defend the home. So this court has already acknowledged that these weapons are not self-defense weapons. If we assume for a moment that they are arms within the meaning of the Second Amendment, which would mean that they satisfy the test as you describe it, understandably, as in common use for lawful purposes, how did you say, is it for self-defense? If we assume, and that, as I take it, doesn't mean necessarily that the common reason for purchase is for self-defense. It could be many different reasons why one buys it, but it happens in a byproduct of this very popular arm, is that it can be used in self-defense. So if we assume that much, therefore we then have to do some inquiry into the legitimacy of the regulation. How do you propose we do that? You suggest that we apply intermediate scrutiny. Now, there's a bunch of different ways one could get to that conclusion. I'm trying to figure out which is the way it is. One possibility is the conclusion would be it doesn't burden the right at all. That seems a little bit difficult to say if we're treating it as an arm, and you make it as a condition of an arm that it be at least capable of use for self-defense. It would seem that a ban on it might be thought to at least burden it somewhat. Another possibility is there's some degree of burden that one has to reach before one would get outside intermediate scrutiny, et cetera. But can you just walk me through how I'm supposed to think about the analysis at that point? Gould addresses this directly. So what it says is this court is to ask whether the statute heavily burdens the right to self-defense in the home. So the word heavily was what Gould used. And all the other courts of appeals that have analyzed these types of bans are in accord. They use severely burden or substantially burden. I think they roughly treat these as synonyms. But there has to be here a heavy burden on the right of self-defense in the home in order for strict scrutiny to apply. Otherwise, an immediate scrutiny applies, as in Gould. And part of the reason why I'm emphasizing how clear the record is on self-defense is that there just is not a heavy burden in this case from the statute. All of the plaintiffs themselves. Is there an absence of heavy burden because there is no evidence of its use for self-defense? There's that, Your Honor. But there's also the evidence that in Massachusetts, law-abiding citizens have access to hundreds if not thousands of other weapons that they can use for self-defense in the home. As Your Honors have pointed out, other semiautomatic rifles, semiautomatic handguns, semiautomatic shotguns, and all of the plaintiffs in this case, in fact, already own semiautomatic weapons. Just so I understand, would that mean in Heller, your analysis would suggest that intermediate scrutiny applies to the ban in Heller? The court said that under any standard of scrutiny. I know that. That's why I'm having trouble. Because it didn't tell me what standard to apply. I think Heller, if the court had been pressed, would have applied strict scrutiny. In that instance, there were thousands of other types of weapons also. And yet you say strict scrutiny would apply. So it can't be that because there are thousands of other weapons here, strict scrutiny does not apply. Judge Barron, as your questioning indicated earlier, I think the core of Heller is that the handgun is the quintessential self-defense weapon. It's the weapon that, as you said, Heller said, are overwhelmingly chosen for self-defense. And it's the vast majority of weapons in circulation in this country. So in that case, banning that weapon, you couldn't substitute other weapons like long guns. That's what the court said. But that doesn't mean when you're talking about a much narrower class of weapons that are not the quintessential self-defense weapon that you can't look to the availability of other weapons as alternatives. And I'd just point out that every court of appeals, Colby, that at Second Circuit, the D.C. Circuit, the Seventh Circuit have all said the availability of handguns and other guns for self-defense means the burden is not severe from these bans. Thank you. If I may briefly. The bright line in Heller was presaged in Staples. The court there dealt with what they considered to be traditional, lawful firearm, an AR-15. And even though in that case, unbeknownst to the owner, or at least the government couldn't prove he knew it, it had been converted to automatic fire, there was no reason for him to think that it was an automatic weapon. And the machine gun was brightly contrasted in that case to a semi-automatic AR-15. Staples wasn't a Second Amendment case, was it? Of course not. But that was carried forward, and that's what was in mind when we're talking in Heller about a like M-16. And if you continue to the end of that meditation, it says if weapons that are most useful in military service, M-16 rifles like may be banned. And then it goes on to contrast the sorts of lawful weapons that they possessed at home to sophisticated arms that are highly unusual in society at large. That's what they were referring to. That goes to the question of whether it's an arm under the Second Amendment. Exactly. That's the question of what you can do to it. And for a moment, just imagine that we're agreeing that it was a covered arm, but we're not agreeing that it's this categorical text tradition standard and that there is some scrutiny analysis that we're supposed to do. How do you propose we go about doing it? In the Gould case, and Judge Sully, if I may borrow from some of your language there, in the four walls of his own house, he may need to provide protection for himself and his family in case of emergency. And the availability of firearms inside the home implicate the safety only of those who live or visit there, not the general public. That's why the right is at its zenith there. And I'm telling you, you should not be telling that citizen they're limited to five  A hundred? Not five or six. And certainly not ten either. Well then, this matters to the inquiry we're supposed to do. If it's about how many, then you are acknowledging it's a question of burden. If it doesn't matter how many, then it could be a million rounds. How many is decided by the popularity of the firearms in the magazines. A hundred round magazines are not popular. They're not typically possessed by law-abiding citizens. That's outside the realm of the Second Amendment. I'm not here to defend hundred round magazines. That's not what this case is about. Thank you, Your Honor. If my time is up, we respectfully request that you consider our appeal. Thank you.